ST. PAUL FIRE & MARINE INSURANCE CO. ET AL. *v.*
BARRY ET AL.

No. 77–240.   Argued March 27, 1978—Decided June 29, 1978

532

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. STEWART, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 555.

*Sidney S. Rosdeitcher* argued the cause for petitioners. With him on the briefs were *Howard S. Veisz, Thomas D. Gidley, Stephen J. Carlotti, Charles Lister, Joseph A. Kelly, Walker B. Comegys, Kirk Hanson,* and *Joseph V. Cavanagh.*

*Leonard Decof* argued the cause and filed a brief for respondents.

*Deputy Solicitor General Friedman* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General McCree, Assistant Attorney General Shenefield, Richard A. Allen,* and *John J. Powers III.**

MR. JUSTICE POWELL delivered the opinion of the Court.

Respondents, licensed physicians practicing in the State of Rhode Island and their patients, brought a class action, in part under the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1 *et seq.* (1976 ed.), against petitioners, the four insurance companies writing medical malpractice insurance in the State. The complaint alleged a private conspiracy of the four companies in which three refused to sell respondents insurance of any type as a means of compelling their submission to new ground rules of coverage set by the fourth. Petitioner insurers successfully moved in District Court to dismiss the antitrust claim on the ground that it was barred by the McCarran-Ferguson Act (Act), 59 Stat. 33, as amended, 15 U. S. C.

---

*Briefs of *amici curiae* urging reversal were filed by *Richard A. Whiting* and *Loren Kieve* for the American Insurance Assn. et al.; and by *Jon S. Hanson* for the National Association of Insurance Commissioners.

*Roger Tilbury* and *Henry Kane* filed a brief for the Portland Retail Druggists Assn., Inc., as *amicus curiae* urging affirmance.

*Eugene Greener, Jr.,* filed a brief for Lakeside Hospital, Inc., as *amicus curiae.*

§§ 1011–1015 (1976 ed.).[1] The Court of Appeals reversed, holding that respondents' complaint stated a claim within the "boycott" exception in § 3 (b) of the Act, which provides that the Sherman Act shall remain applicable "to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation," 15 U. S. C. § 1013 (b) (1976 ed.). 555 F. 2d 3 (CA1 1977). We are required to decide whether the "boycott" exception applies to disputes between policyholders and insurers.

## I

As this case comes to us from the reversal of a successful motion to dismiss, we treat the factual allegations of respondents' amended complaint as true.[2] During the period in

---

[1] The McCarran-Ferguson Act provides in relevant part:

"Sec. 2. (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State Law.

. . . . .

"Sec. 3 (b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." 59 Stat. 34, as amended, 61 Stat. 448, 15 U. S. C. §§ 1012, 1013 (b) (1976 ed.).

[2] Both the amended complaint and a second amended complaint, filed after the District Court's dismissal of the antitrust claim, also alleged several state-law claims. Review of the disposition of those claims has not been sought in this Court.

To the extent the complaint alleges a violation of the Clayton Act, 38 Stat. 730, as amended, 15 U. S. C. § 12 *et seq.* (1976 ed.), that claim is barred by respondents' concession that the requirements of § 2 (b) of the McCarran-Ferguson Act are satisfied in this case. See n. 9, *infra.*

question, petitioners St. Paul Fire & Marine Insurance Co. (St. Paul), Aetna Casualty & Surety Co., Travelers Indemnity of Rhode Island (and two affiliated companies), and Hartford Casualty Co. (and an affiliated company) were the only sellers of medical malpractice insurance in Rhode Island. In April 1975, St. Paul, the largest of the insurers, announced that it would not renew medical malpractice coverage on an "occurrence" basis, but would write insurance only on a "claims made" basis.[3] Following St. Paul's announcement, and in furtherance of the alleged conspiracy, the other petitioners refused to accept applications for any type of insurance from physicians, hospitals, or other medical personnel whom St. Paul then insured. The object of the conspiracy was to restrict St. Paul's policyholders to "claims made" coverage by compelling them to "purchase medical malpractice insurance from one insurer only, to wit defendant, St. Paul, and that [such] purchase must be made on terms dictated by the defendant, St. Paul." App. 25. It is alleged that this scheme was effectuated by a collective refusal to deal, by unfair rate discrimination, by agreements not to compete, and by horizontal price fixing, and that petitioners engaged in "a purposeful course of coercion, intimidation, boycott and unfair competition with respect to the sale of medical malpractice insurance in the State of Rhode Island." *Id.*, at 24–27.[4]

---

[3] An "occurrence" policy protects the policyholder from liability for any act done while the policy is in effect, whereas a "claims made" policy protects the holder only against claims made during the life of the policy. The Court of Appeals noted that "a doctor who practiced for only one year, say 1972, would need only one 1972 'occurrence' policy to be fully covered, but he would need several years of 'claims made' policies to protect himself from claims arising out of his acts in 1972." 555 F. 2d 3, 5 n. 1 (CA1 1977).

[4] Respondents further assert that "it is virtually impossible for a physician, hospital or other medical personnel to engage in the practice of medicine or provide medical services or treatment without medical malpractice insurance," App. 22, and that as a result of petitioners' conspiracy,

On November 19, 1975, the District Court for the District of Rhode Island granted petitioners' motion to dismiss. The District Court declined to give the "boycott" exception the reading suggested by its "broad wording," declaring instead that "the purpose of the boycott, coercion, and intimidation exception was solely to protect insurance agents or other insurance companies from being 'black-listed' by powerful combinations of insurance companies, not to affect the insurer-insured relationship." *Id.*, at 44.

On May 16, 1977, a divided panel of the Court of Appeals for the First Circuit reversed in pertinent part. The majority reasoned that the "boycott" exception was broadly framed, and that there was no reason to decline to give the term "boycott" its "normal Sherman Act scope." 555 F. 2d, at 8. "In antitrust law, a boycott is a 'concerted refusal to deal' with a disfavored purchaser or seller." *Id.*, at 7. The court thought that this reading would not undermine state regulation of the industry. "Regulation by the state would be protected; concerted boycotts against groups of consumers not resting on state authority would have no immunity." *Id.*, at 9.

On August 12, 1977, petitioners sought a writ of certiorari in this Court. To resolve the conflicting interpretations of § 3 (b) adopted by several Courts of Appeals,[5] we granted the writ on October 31, 1977. 434 U. S. 919. We now affirm.

---

they "may be forced to withhold medical services and disengage from the practice of medicine, except on an emergency basis," *id.*, at 26.

[5] Following the rendition of the legislative history in *Transnational Ins. Co.* v. *Rosenlund,* 261 F. Supp. 12 (Ore. 1966), two Circuits squarely have held that § 3 (b) reaches only "blacklists" of insurance companies or agents by other insurance companies or agents. See *Meicler* v. *Aetna Casualty & Surety Co.,* 506 F. 2d 732, 734 (CA5 1975); but cf. *Battle* v. *Liberty National Life Ins. Co.,* 493 F. 2d 39, 51 (CA5 1974), cert. denied, 419 U. S. 1110 (1975); *Addrissi* v. *Equitable Life Assurance Soc.,* 503 F. 2d 725, 729 (CA9 1974), cert. denied, 420 U. S. 929 (1975).

Two other Circuits have adopted a broader reading of § 3 (b). See *Ballard* v. *Blue Shield of Southern W. Va., Inc.,* 543 F. 2d 1075, 1078 (CA4 1976), cert. denied, 430 U. S. 922 (1977) (alleged conspiracy

## II

At the threshold, we confront a question of mootness. Although not raised by the parties, this issue implicates our jurisdiction. See, *e. g., Memphis Light, Gas & Water Div.* v. *Craft,* 436 U. S. 1, 7–8 (1978); *Sosna* v. *Iowa,* 419 U. S. 393, 398 (1975).

The Court of Appeals requested the parties to brief the question whether the antitrust claim was mooted by Rhode Island's formation, after the initial complaint was filed, of a Joint Underwriting Association (JUA) to provide malpractice insurance to all licensed providers of health-care services and to require the participation of all personal-injury liability insurers in the State in a scheme to pool expenses and losses in providing such insurance.[6] The court noted that while the State's action prevented St. Paul from "gather[ing] the fruits of the alleged conspiracy," it was "convinced that, for purposes of [its] jurisdiction, the state's act did not extinguish plaintiffs' every claim for relief." 555 F. 2d, at 5–6, n. 2. We agree.

Although later developments may have "reduce[d] the

---

between insurers and physicians to deny health insurance coverage for chiropractic services); *Proctor* v. *State Farm Mut. Auto. Ins. Co.,* 182 U. S. App. D. C. 264, 276–277, 561 F. 2d 262, 274–275 (1977), cert. pending, No. 77–580 (alleged conspiracy between insurers and automobile repair shops to boycott noncooperative repair shops). See also *Monarch Life Ins. Co.* v. *Loyal Protective Life Ins. Co.,* 326 F. 2d 841, 846 (CA2 1963) (dictum), cert. denied, 376 U. S. 952 (1964).

[6] To establish a stable market for medical malpractice insurance, the JUA was created on a temporary basis by Emergency Regulation XXI, R. I. Dept. of Business Regulation, Insurance Div., June 16, 1975, App. 114–127, and received legislative sanction in R. I. Gen. Laws § 42–14.1–1 (1977). The emergency regulation was revised in April 1976 to permit the writing of medical malpractice insurance outside the JUA for all providers of health-care services other than physicians. App. 150–151. A subsequent change in state law authorizes the Director to promulgate regulations permitting the selling of such insurance outside of the JUA to physicians as well. 1976 R. I. Pub. Laws, ch. 79, § 1.

practical importance of this case" for the parties, it cannot be said that "subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States* v. *Phosphate Export Assn.*, 393 U. S. 199, 203 (1968); see *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 632–633 (1953). Since Rhode Island now permits the writing of medical malpractice insurance outside of the JUA, see n. 6, *supra*, we cannot assume that petitioners will not re-enter the market in some fashion. The conditions that gave rise to the controversy have not been shown to have abated. And the possibility of a resurgence of the alleged conspiracy is further evidenced by petitioners' acknowledgment in the Court of Appeals "that the alleged antitrust violations could recur in the future." 2 Record 83.[7]

## III

The McCarran-Ferguson Act was passed in reaction to this Court's decision in *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533 (1944). Prior to that decision, it had been assumed, in light of *Paul* v. *Virginia*, 8 Wall. 168, 183

---

[7] Although this case is technically not moot, the parties are not barred from showing, "on remand, that the likelihood of further violations is sufficiently remote to make injunctive relief unnecessary." *United States* v. *Phosphate Export Assn.*, 393 U. S. 199, 203 (1968); see *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 633–636 (1953).

We have not addressed respondents' claim for damages arising out of their inability "to obtain medical malpractice insurance on a reasonable basis after June 30, 1975," App. 26. Such a claim might itself preclude a finding of mootness, see *e. g.*, *Memphis Light, Gas & Water Div.* v. *Craft*, 436 U. S. 1, 8–9 (1978), but the parties have not advised the Court whether this claim survives the formation of the JUA. The Court of Appeals stated that respondents were "entitled to seek both injunctive relief and treble damages," noting, in a separate discussion, that "the change in malpractice coverage has increased costs for the doctors." 555 F. 2d, at 12, and n. 7. The validity of the damages claim, in light of the role of the JUA and the considerations identified in this decision, is a matter for initial determination by the courts below.

(1869), that the issuance of an insurance policy was not a transaction in interstate commerce and that the States enjoyed a virtually exclusive domain over the insurance industry. *South-Eastern Underwriters* held that a fire insurance company which conducted a substantial part of its transactions across state lines is engaged in interstate commerce, and that Congress did not intend to exempt the business of insurance from the operation of the Sherman Act.[8] The decision provoked widespread concern that the States would no longer be able to engage in taxation and effective regulation of the insurance industry. Congress moved quickly, enacting the McCarran-Ferguson Act within a year of the decision in *South-Eastern Underwriters.*

As this Court observed shortly afterward, "[o]bviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance." *Prudential Insurance Co.* v. *Benjamin,* 328 U. S. 408, 429 (1946). Our decisions have given effect to this purpose in construing the operative terms of the § 2 (b) proviso, which is the critical provision limiting the general applicability of the federal antitrust laws "to the business of insurance to the extent that such business is not regulated by State Law." See *SEC* v. *National Securities, Inc.,* 393 U. S. 453, 460 (1969); *FTC* v. *National Casualty Co.,* 357 U. S.

---

[8] The Government in that case brought a Sherman Act prosecution against the South-Eastern Underwriters Association (SEUA), its membership of nearly 200 private stock fire insurance companies, and 27 individuals. The indictment alleged conspiracies to maintain arbitrary and noncompetitive premium rates on fire and "allied lines" of insurance in several States, and to monopolize trade and commerce in the same lines of insurance. It was asserted that the conspirators not only fixed rates but also, in the Court's words, "employed boycotts together with other types of coercion and intimidation to force nonmember insurance companies into the conspiracies, and to compel persons who needed insurance to buy only from [SEUA] members on [SEUA] terms." *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S., at 535.

560 (1958); *infra,* at 550–551. Section 2 (b) is not in issue in this case.[9] Rather, we are called upon to interpret, for the first time, the scope of § 3 (b), the principal exception to this scheme of pre-emptive state regulation of the "business of insurance."

The Court of Appeals in this case determined that the word "boycott" in § 3 (b) should be given its ordinary Sherman Act meaning as "a concerted refusal to deal." The "boycott" exception, so read, covered the alleged conspiracy of petitioners, conducted "outside any state-permitted structure or procedure, [to] agree among themselves that customers dissatisfied with the coverage offered by one company shall not be sold any policies by any of the other companies." 555 F. 2d, at 9.

Petitioners take strong exception to this reading, arguing that the "boycott" exception "should be limited to cases where concerted refusals to deal are used to exclude or penalize insurance companies or other traders which refuse to conform their competitive practices to terms dictated by the conspiracy." Brief for Petitioners 13. This definition is said to accord with the plain meaning and judicial interpretations of the term "boycott," with the evidence of specific legislative intent, and with the overall structure of the Act. Respondents counter that the language of § 3 (b) is sweeping, and that there is no warrant for the view that the exception protects insurance companies "or other traders" from anticompetitive practices, but withholds similar protection from policyholders victimized by private, predatory agreements. They urge that this case involves a "traditional boycott," defined as a concerted refusal to deal on any terms, as opposed to a refusal to deal except on specified terms. Brief for Respondents 43.

---

[9] Respondents did not contest below "that [petitioners'] acts were related to the business of insurance and that Rhode Island effectively regulates that business." 555 F. 2d, at 6. They do not argue to the contrary in this Court.

We consider first petitioners' definition of "boycott" in view of the language, legislative history, and structure of the Act.[10]

## IV

### A

The starting point in any case involving construction of a statute is the language itself. See *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (1975) (POWELL, J., concurring). With economy of expression, Congress provided in § 3 (b) for the continued applicability of the Sherman Act to "any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." Congress thus employed terminology that evokes a tradition of meaning, as elaborated in the body of decisions interpreting the Sherman Act. It may be assumed, in the absence of indications to the contrary, that Congress intended this language to be read in light of that tradition.

The generic concept of boycott refers to a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target.[11] The word gained currency in this country largely as a term of opprobrium to describe certain tactics employed by parties to labor disputes. See, *e. g., State* v. *Glidden,* 55 Conn. 46, 8 A. 890 (1887); Laidler, Boycott, in 2 Encyclopaedia of the Social Sciences 662–666 (1930). Thus it is not surprising that the term first entered the lexicon of antitrust law in decisions involving attempts by labor unions to encourage third parties

---

[10] The Court of Appeals' ruling rested on the determination that respondents charged petitioners "with an unlawful boycott," *id.,* at 12. In light of our disposition of this case, we do not decide the scope of the terms "coercion" and "intimidation" in § 3 (b).

[11] See Bird, Sherman Act Limitations on Noncommercial Concerted Refusals to Deal, 1970 Duke L. J. 247, 248; Webster's New International Dictionary of the English Language 321 (2d ed. 1949); 1 The Oxford English Dictionary 1040 (1933); Black's Law Dictionary 234 (4th ed. 1968).

to cease or suspend doing business with employers unwilling to permit unionization.[12]  See, *e. g., Loewe* v. *Lawlor,* 208 U. S. 274 (1908); *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418 (1911); *Lawlor* v. *Loewe,* 235 U. S. 522 (1915); *Duplex Co.* v. *Deering,* 254 U. S. 443 (1921); *Bedford Stone Co.* v. *Stone Cutters' Assn.,* 274 U. S. 37 (1927).[13]

Petitioners define "boycott" as embracing only those combinations which target *competitors* of the boycotters as the ultimate objects of a concerted refusal to deal.  They cite commentary that attempts to develop a test for distinguishing the types of restraints that warrant *per se* invalidation from other concerted refusals to deal that are not inherently destructive of competition.[14]  But the issue before us is whether the conduct in question involves a boycott, not whether it is *per se* unreasonable.  In this regard, we have not been re-

---

[12] The first decision of this Court dealing with a boycott situation, although without using the term, appears to be *Montague & Co.* v. *Lowry,* 193 U. S. 38 (1904), a nonlabor case involving an association of wholesalers and manufacturers that provided in its bylaws that no dealer member could buy from any manufacturer who was not a member of the association or sell for less than list price to a nonmember.  See Kirkpatrick, Commercial Boycotts as Per Se Violations of the Sherman Act, 10 Geo. Wash. L. Rev. 302, 306–307 (1942).

[13] The cases cited in the text are significant for their general interpretation of the Sherman Act even though they are no longer controlling as to the applicability of the antitrust laws to the activities of labor unions. See *Connell Co.* v. *Plumbers & Steamfitters,* 421 U. S. 616, 621–623 (1975); *United States* v. *Hutcheson,* 312 U. S. 219, 234 (1941); *Drivers' Union* v. *Lake Valley Co.,* 311 U. S. 91, 102–103 (1940).

[14] See L. Sullivan, Handbook of the Law of Antitrust 256–259 (1977). Other commentators have framed a somewhat broader definition for a *per se* offense in this area.  See Barber, Refusals to Deal under the Federal Antitrust Laws, 103 U. Pa. L. Rev. 847, 875 (1955) ("group action to coerce third parties to conform to the pattern of conduct desired by the group or to secure their removal from competition"); Kirkpatrick, *supra* n. 12, at 305 ("interference with the relations between a nonmember of the combination and its members or others").  We express no opinion, however, as to the merit of any of these definitions.

ferred to any decision of this Court holding that petitioners' test states the necessary elements of a boycott within the purview of the Sherman Act. Indeed, the decisions reflect a marked lack of uniformity in defining the term.

Petitioners refer to cases stating that "group boycotts" are "concerted refusals by traders to deal with other traders," *Klor's* v. *Broadway-Hale Stores,* 359 U. S. 207, 212 (1959), or are combinations of businessmen "to deprive others of access to merchandise which the latter wish to sell to the public," *United States* v. *General Motors Corp.,* 384 U. S. 127, 146 (1966). We note that neither standard in terms excludes respondents— for whom medical malpractice insurance is necessary to ply their "trade" of providing health-care services, see n. 4, *supra*— from the class of cognizable victims. But other verbal formulas also have been used. In *FMC* v. *Svenska Amerika Linien,* 390 U. S. 238, 250 (1968), for example, the Court noted that "[u]nder the Sherman Act, any agreement by a group of competitors to boycott a particular buyer or group of buyers is illegal *per se.*" The Court also has stated broadly that "group boycotts, or concerted refusals to deal, clearly run afoul of § 1 [of the Sherman Act]." *Times-Picayune* v. *United States,* 345 U. S. 594, 625 (1953). Hence, "boycotts are not a unitary phenomenon." P. Areeda, Antitrust Analysis 381 (2d ed. 1974).

As the labor-boycott cases illustrate, the boycotters and the ultimate target need not be in a competitive relationship with each other. This Court also has held unlawful, concerted refusals to deal in cases where the target is a customer of some or all of the conspirators who is being denied access to desired goods or services because of a refusal to accede to particular terms set by some or all of the sellers. See, *e. g., Paramount Famous Corp.* v. *United States,* 282 U. S. 30 (1930); *United States* v. *First Nat. Pictures, Inc.,* 282 U. S. 44 (1930); *Binderup* v. *Pathe Exchange,* 263 U. S. 291 (1923). See also *Anderson* v. *Shipowners Assn.,* 272 U. S. 359 (1926). As the

Court put it in *Kiefer-Stewart Co.* v. *Seagram & Sons,* 340 U. S. 211, 214 (1951), "the Sherman Act makes it an offense for '[businessmen] to agree among themselves to stop selling to particular customers." [15]

Whatever other characterizations are possible,[16] petitioners' conduct fairly may be viewed as "an organized boycott," *Fashion Guild* v. *FTC,* 312 U. S. 457, 465 (1941), of St. Paul's policyholders. Solely for the purpose of forcing physicians and hospitals to accede to a substantial curtailment of the coverage previously available, St. Paul induced its competitors to refuse to deal on any terms with its customers. This agreement did not simply fix rates or terms of coverage; it effectively barred St. Paul's policyholders from all access to alternative sources of coverage and even from negotiating for more favorable terms elsewhere in the market. The pact served as a tactical weapon invoked by St. Paul in support of a dispute with its policyholders. The enlistment of third parties in an agreement not to trade, as a means of compelling capitulation by the boycotted group, long has been

---

[15] *Kiefer-Stewart Co.* involved a horizontal resale price maintenance scheme, see *White Motor Co.* v. *United States,* 372 U. S. 253, 260 (1963), but it has been cited as a "group boycott" case, see *Klor's* v. *Broadway-Hale Stores,* 359 U. S. 207, 212 n. 5 (1959); *Times-Picayune* v. *United States,* 345 U. S. 594, 625 (1953). See also *United States* v. *Frankfort Distilleries,* 324 U. S. 293, 295–296 (1945) (alleged conspiracy of producers, wholesalers, and retailers to maintain local retail prices by means of a "boycott program").

See generally Report of the U. S. Attorney General's National Committee to Study the Antitrust Laws 137 (1955) ("approv[ing] the established legal doctrines which condemn group boycotts of customers or suppliers as routine unreasonable restraints forbidden by Section 1 of the Sherman Act").

[16] Petitioners suggest that the alleged conspiracy in this case presents a horizontal agreement not to compete, as distinguished from a boycott. See *United States* v. *Topco Associates,* 405 U. S. 596, 612 (1972); *United States* v. *Consolidated Laundries Corp.,* 291 F. 2d 563, 573–575 (CA2 1961).

viewed as conduct supporting a finding of unlawful boycott. *Eastern States Lumber Assn.* v. *United States,* 234 U. S. 600, 612–613 (1914), citing *Loewe* v. *Lawlor, supra;* see *Klor's* v. *Broadway-Hale Stores, supra,* at 213; *Anderson* v. *Ship-owners Assn., supra,* at 362–363, 364–365. As in *Binderup* v. *Pathe Exchange, supra,* at 312, where film distributors had conspired to cease dealing with an exhibitor because he had declined to purchase films from some of the distributors, "[t]he illegality consists, not in the separate action of each, but in the conspiracy and combination of all to prevent any of them from dealing with the [target]." [17]

Thus if the statutory language is read in light of the customary understanding of "boycott" at the time of enactment, respondents' complaint states a claim under § 3 (b).[18] But, as Mr. Justice Cardozo observed, words or phrases in a statute come "freighted with the meaning imparted to them by the mischief to be remedied and by contemporaneous discussion. In such conditions history is a teacher that is not

---

[17] As one commentator has noted: "If an individual competitor lacks the bargaining power to get a particular contract term, the courts apparently will not let him join with other competitors and use their collective bargaining power to compel the insertion of such a term in the contract, no matter how desirable." Bird, *supra* n. 11, at 263, discussing, *inter alia, Binderup* v. *Pathe Exchange; Paramount Famous Corp.* v. *United States,* 282 U. S. 30 (1930).

[18] We note our disagreement with MR. JUSTICE STEWART's expression of alarm that a reading of the operative terms of § 3 (b), consistent with traditional Sherman Act usage, "would plainly devour the broad antitrust immunity bestowed by § 2 (b)." *Post,* at 559. Whatever the precise reach of the terms "boycott," "coercion," and "intimidation," the decisions of this Court do not support the dissent's suggestion that they are coextensive with the prohibitions of the Sherman Act. See, *e. g., Eastern States Lumber Assn.* v. *United States,* 234 U. S. 600, 611 (1914), quoting *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 438 (1911). In this regard, we are not cited to any decision illustrating the assertion, *post,* at 559 n. 6, that price fixing, in the absence of any additional enforcement activity, has been treated either as "a boycott" or "coercion."

to be ignored." *Duparquet Co. v. Evans,* 297 U. S. 216, 221 (1936) (citation omitted). We therefore must consider whether Congress intended to attach a special meaning to the word "boycott" in § 3 (b).

B

In the Court of Appeals, petitioners argued that only insurance companies and agents could be victims of practices within the reach of the "boycott" exception.[19] That position enjoys some support in the legislative history because the principal targets of the practices termed "boycotts" and "other types of coercion and intimidation" in *South-Eastern Underwriters* were insurance companies that did not belong to the industry association charged with the conspiracy, as well as agents and customers who dealt with those nonmembers. See 322 U. S., at 535–536. Moreover, there are references in the debates to the need for preventing insurance companies and agents from "blacklisting" and imposing other sanctions against uncooperative competitors or agents. See 91 Cong. Rec. 1087 (1945) (remarks of Rep. Celler); *id.,* at 1485–1486 (remarks of Sen. O'Mahoney). In this Court, however, petitioners expanded the list of potential targets of § 3 (b) conduct to include any victim—even one outside the insurance industry—who is in a competitive relationship with any of the members of the boycotting group. Tr. of Oral Arg. 22, 57–58.

The principal exception in the McCarran-Ferguson bill to the pre-emptive role of state regulation was for acts or agreements amounting to a "boycott, coercion, or intimidation" violative of the Sherman Act. Both Committee Reports stated: "[A]t no time are the prohibitions in the Sherman Act against any agreement or act of boycott, coercion, or in-

---

[19] Brief for Appellees Aetna Casualty & Surety Co. et al. in No. 76–1226, p. 18 (CA1); Brief for Appellees St. Paul et al. in No. 76–1226, p. 14 (CA1).

timidation suspended. These provisions of the Sherman Act remain in full force and effect." S. Rep. No. 20, 79th Cong., 1st Sess., 3 (1945); H. R. Rep. No. 143, 79th Cong., 1st Sess., 3 (1945). The debates make clear that the "boycott" exception was viewed by the Act's proponents as an important safeguard against the danger that insurance companies might take advantage of purely permissive state legislation to establish monopolies and enter into restrictive agreements falling outside the realm of state-supervised cooperative action.

The bill ultimately enacted emerged from Conference Committee as a compromise between conflicting Senate and House proposals.[20] Although the conference substitute quickly gained approval in the House, it encountered opposition in the Senate. Senator Pepper spoke at length against privileging the States "[to enact] some mild form of legislation which they may call regulatory, thereby defeating the purpose of the Supreme Court decision and defeating the act itself." 91 Cong. Rec. 1443 (1945). The responses of Senators Ferguson and O'Mahoney, floor managers of the conference bill, indicate

---

[20] The bill introduced by Senators McCarran and Ferguson (S. 340) provided that only federal legislation specifically dealing with insurance could override state laws relating to the regulation or taxation of that business, and created a moratorium period, staying the operation of the Sherman and Clayton Acts to enable the States to adjust their statutes to *South-Eastern Underwriters*. S. Rep. No. 20, 79th Cong., 1st Sess. (1945); 91 Cong. Rec. 478 (1945). Largely at the insistence of Senator O'Mahoney, it was amended on the floor of the Senate to provide that the Sherman and Clayton Acts would not be pre-empted at the expiration of the moratorium. *Id.*, at 488. The bill introduced in the House and reported favorably out of committee contained provisions that were similar to the original bill in the Senate. H. R. Rep. No. 143, 79th Cong., 1st Sess., 1 (1945); 91 Cong. Rec. 1085 (1945). The bill as reported passed the House. A Conference Committee then was appointed, composed of Senators McCarran, O'Mahoney, and Ferguson, and Representatives Sumners, Walter, and Hancock. In place of the Senate floor amendment, the conference substitute added the proviso to § 2 (b) that is presently in the Act. H. R. Conf. Rep. No. 213, 79th Cong., 1st Sess., 1–2 (1945).

that while Congress was willing to permit the States to sub-
stitute regulation for competition with respect to matters such
as rates and terms of coverage, the "boycott" clause defined a
range of conduct that would remain within the purview of the
Sherman Act.[21]

Petitioners cite passages of the debates in which Senator
O'Mahoney refers to "blacklisting" and other exclusionary
devices directed at independent insurance companies or agents.
But those passages also provide support for respondents' posi-
tion that the eradication of such practices was not the only
objective of Congress in enacting § 3 (b). In Senator
O'Mahoney's view, "[t]he vice in the insurance industry . . .
was not that there were rating bureaus, but that there was in
the industry a system of private government which had been
built up by a small group of insurance companies, which
companies undertook by their agreements and understandings
to invade the field of Congress to regulate commerce." 91
Cong. Rec. 1485 (1945). The conference substitute, he in-
sisted, "outlaws completely all steps by which small groups
have attempted to establish themselves in control in the great
interstate and international business of insurance." *Ibid.*
Perhaps the most revealing discussion is found in his explana-
tion of why the language of § 3 (b) was limited to "boycotts,

---

[21] Senator Ferguson perceived a distinction between legislation authoriz-
ing "rating bureaus," which would not be disturbed by the bill, 91 Cong.
Rec. 1481 (1945), and legislation permitting insurance companies to engage
in practices constituting a "boycott, coercion, or intimidation," which
would remain subject to the Sherman Act, *ibid.*

Senator O'Mahoney noted that the conference substitute would permit
"certain agreements which can normally be made in the insurance busi-
ness which are in the public interest, but which might conceivably be a
violation of the antitrust law," such as a "rating bureau" operating "under
the supervision and regulation of the State . . . ." *Id.,* at 1444. But
other practices constituting "regulation by private combinations and groups,"
*id.,* at 1483, would have to pass muster under the Sherman Act.

coercion, or intimidation," and did not reach all combinations among insurance companies and their agents. He stated:

> "[T]he committee was cognizant of the fact that many salutary combinations might be proposed and which ought to be approved, to which there was no objection. From the very beginning, Mr. President, of this controversy over insurance I have always taken the position that I saw no objection to combinations or agreements among the companies in the public interest *provided those combinations and agreements were in the open and approved by law. Public supervision of agreements is essential.*
>
> .　　　.　　　.　　　.　　　.
>
> "[M]y judgment is that *every effective combination or agreement to carry out a program against the public interest of which I have had any knowledge* in this whole industry study *would be prohibited by* [§ *3 (b)*]." 91 Cong. Rec. 1486 (1945) (emphasis supplied).

The rules and regulations of private associations in the industry, while providing Senator O'Mahoney with a vivid example of "the sort of agreement which ought to be condemned," *ibid.,* exemplified a larger evil—"regulation by private combinations and groups," *id.,* at 1483—that required the continued application of the Sherman Act.[22]

---

[22] The dissenting opinion of MR. JUSTICE STEWART advances the view, abandoned by petitioners in this Court, see *supra,* at 546, that § 3 (b) applies only "to the kinds of antitrust violations alleged in *South-Eastern Underwriters* . . . ." *Post,* at 565. The dissent refers to no statement, either in the Committee Reports or the debates, asserting that § 3 (b)'s only purpose was to keep alive the *South-Eastern Underwriters* indictment or purporting to restrict its scope to the practices specifically alleged therein. There is nothing in the proposal of the National Association of Insurance Commissioners, identified by the dissent as the model for the Senate bill, S. 340, that evinces such a limited purpose. The report accompanying the proposal stated in pertinent part:

"No exemption is sought nor expected for oppressive or destructive practices. On the whole, insurance has been conducted on a high plane,

The language of § 3 (b) is broad and unqualified; it covers "any" act or agreement amounting to a "boycott, coercion, or intimidation." If Congress had intended to limit its scope to boycotts of competing insurance companies or agents, and to preclude all Sherman Act protection for policyholders, it is not unreasonable to assume that it would have made this explicit. While the legislative history does not point unambiguously to the answer, it provides no substantial support for limiting language that Congress itself chose not to limit.[23]

## C

Petitioners also contend that the structure of the Act supports their reading of § 3 (b). They note that this Court

---

with great benefit to the public, *and if inconsistent procedures are found they must be eradicated.* Provision is made that the Sherman Act shall not now *or hereafter* be inapplicable to any act of boycott, coercion, or intimidation." 90 Cong. Rec. A4406 (1944) (emphasis supplied).

It is difficult to view this language as supporting the dissent's interpretation.

It also is asserted that the "boycott" clause in the Senate bill was intended to apply only during the moratorium period, a fact which supposedly supports the dissent's narrow reading of the clause. But the dissent concedes that "[w]hatever its initial impetus . . . , there is no indication that the provision was finally thought to be applicable only to the *South-Eastern* litigation." *Post,* at 563–564, n. 20. Moreover, neither the Committee Reports, see *supra,* at 546–547, nor the insurance commissioners' statement, quoted above, suggests an intent to suspend the operation of the "boycott" clause at any time. Certainly Senator Ferguson disclaimed such an intent, stating he saw "no reason for not changing the word 'section' to 'act,' because I am of the opinion that that was the intention of all concerned." 91 Cong. Rec. 479 (1945). There simply is no persuasive evidence of an original design merely to preserve the *South-Eastern Underwriters* indictment.

[23] The legislative materials do not demonstrate with necessary clarity "that [Congress] has in fact used a private code, so that what appears to be violence to language is merely respect to special usage." Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 543–544 (1947).

has interpreted the term "business of insurance" in § 2 (b) broadly to encompass "[t]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement," *SEC* v. *National Securities, Inc.*, 393 U. S., at 460, and has held that the mere enactment of "prohibitory legislation" and provision for "a scheme of administrative supervision" constitute adequate regulation to satisfy the proviso to § 2 (b), *FTC* v. *National Casualty Co.*, 357 U. S., at 564–565. Thus, petitioners conclude, § 3 (b) cannot be interpreted in a fashion that would undermine the congressional judgment expressed in § 2 (b) that the protection of policyholders is the primary responsibility of the States and that the state regulation which precludes application of federal law is not limited to regulation specifically authorizing the conduct challenged.

Petitioners rely on a syllogism that is faulty in its premise, for it ignores the fact that § 3 (b) is an exception to § 2 (b), and that Congress intended in the "boycott" clause to carve out of the overall framework of plenary state regulation an area that would remain subject to Sherman Act scrutiny. The structure of the Act embraces this exception. Unless § 3 (b) is read to limit somewhat the sweep of § 2 (b), it serves no purpose whatever. Petitioners do not press their argument that far, but they suggest no persuasive reason for engrafting a particular limitation on § 3 (b) that is justified neither by its language nor by the legislative history.[24]

---

[24] Even under petitioners' reading, certain cooperative arrangements among insurance companies may constitute a "boycott" under § 3 (b) notwithstanding the applicability of § 2 (b) to activities that "relate . . . closely to their status as reliable insurers," *SEC* v. *National Securities, Inc.*, 393 U. S. 453, 460 (1969), and the adequacy of state regulation of the industry. Hence, petitioners' line may not be as "bright" as they suggest.

The dissenting opinion of MR. JUSTICE STEWART also argues that the structure of the Act supports a restrictive reading of § 3 (b). We do not think the dissent's restatement of the holding in *FTC* v. *National Casualty Co.*, 357 U. S. 560, 564 (1958), see *post*, at 557–558, n. 4, furthers resolution

## V

We hold that the term "boycott" is not limited to concerted activity against insurance companies or agents or, more generally, against competitors of members of the boycotting group. It remains to consider whether the type of private conduct alleged to have taken place in this case, directed against policyholders, constitutes a "boycott" within the meaning of § 3 (b).

### A

The conduct in question accords with the common understanding of a boycott. The four insurance companies that control the market in medical malpractice insurance are alleged to have agreed that three of the four would not deal on any terms with the policyholders of the fourth. As a means of ensuring policyholder submission to new, restrictive ground rules of coverage, St. Paul obtained the agreement of the other petitioners, strangers to the immediate dispute, to refuse to sell any insurance to its policyholders. "A valuable service germane to [respondents'] business and important to their effective competition with others was withheld from them by

of the problem at hand. It is not disputed that Congress intended that certain forms of "regulation by private combinations and groups," 91 Cong. Rec. 1483 (1945) (remarks of Sen. O'Mahoney), remain subject to Sherman Act scrutiny, notwithstanding enactment of the type of "prohibitory legislation," coupled with "enforcement through a scheme of administrative supervision," that was deemed sufficient for § 2 (b) purposes in *National Casualty Co.* In that case the Court rejected the Federal Trade Commission's argument that "where a statute, instead of sanctioning a particular type of transaction, prohibits conduct in general terms and provides for enforcement through administrative action, there is realistically, in the absence of such enforcement, no 'regulation' in fact." Brief for Federal Trade Commission, O. T. 1957, Nos. 435 and 436, p. 53. The question that nonetheless remains is whether Congress intended to foreclose *all* Sherman Act protection for policyholders victimized by private conspiracies of insurers when a State has engaged in generally comprehensive regulation under § 2 (b). We think the record does not support such a foreclosure.

collective action." *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 348–349, n. 5 (1963).

The agreement binding petitioners erected a barrier between St. Paul's customers and any alternative source of the desired coverage, effectively foreclosing all possibility of competition anywhere in the relevant market. This concerted refusal to deal went well beyond a private agreement to fix rates and terms of coverage, as it denied policyholders the benefits of competition in vital matters such as claims policy and quality of service. Cf. *Continental T. V., Inc.* v. *GTE Sylvania Inc.,* 433 U. S. 36, 55 (1977). St. Paul's policyholders became the captives of their insurer. In a sense the agreement imposed an even greater restraint on competitive forces than a horizontal pact not to compete with respect to price, coverage, claims policy, and service, since the refusal to deal in any fashion reduced the likelihood that a competitor might have broken ranks as to one or more of the fixed terms.[25] The conduct alleged here is certainly not, in Senator O'Mahoney's terms, within the category of "agreements which can normally be made in the insurance business," 91 Cong. Rec. 1444 (1945), or "agreements and combinations in the public interests [*sic*] which can safely be permitted," *id.,* at 1486.

## B

We emphasize that the conduct with which petitioners are charged appears to have occurred outside of any regulatory or cooperative arrangement established by the laws of Rhode Island. There was no state authorization of the conduct in question. This was the explicit premise of the Court of

---

[25] "[E]ven where prices are rigidly fixed, the members of a cartel will be able to compete with each other with respect to product quality unless a homogeneous product is involved. Indeed, even if the product is homogeneous there will be room for rivalry in such matters as promptness in filling orders and the provision of ancillary services. An effective division of markets, by contrast, might substantially wash out all opportunity for rivalry." Sullivan, *supra* n. 14, at 224–225.

Appeals' decision, see 555 F. 2d, at 9, and petitioners do not aver that state law or regulatory policy can be said to have required or authorized the concerted refusal to deal with St. Paul's customers.[26]

Here the complaint alleges an attempt at "regulation by private combinations and groups," 91 Cong. Rec. 1483 (1945) (remarks of Sen. O'Mahoney). This is not a case where a State has decided that regulatory policy requires that certain categories of risks be allocated in a particular fashion among insurers, or where a State authorizes insurers to decline to insure particular risks because the continued provision of that insurance would undermine certain regulatory goals, such as the maintenance of insurer solvency. In this case, a group of insurers decided to resolve by private action the problem of escalating damages claims and verdicts by coercing the policy-holders of St. Paul to accept a severe limitation of coverage essential to the provision of medical services. See n. 4, *supra*. We conclude that this conduct, as alleged in the complaint, constitutes a "boycott" under § 3 (b).[27]

---

[26] Counsel for petitioners stated at oral argument that he was not sure whether St. Paul had filed the specific policy change in issue with the director of the state insurance division. Tr. of Oral Arg. 8. Even if we assume that such a filing had been made, there is no suggestion that the State, in furtherance of its regulatory policies, authorized the concerted refusal to deal on any terms with St. Paul's policyholders.

Although the dissenting opinion below noted "that Rhode Island has exercised its right to regulate all material aspects of the business of insurance and that the actions complained of relative to withholding malpractice insurance were all part of such regulated business," 555 F. 2d, at 14, this statement refers to the requirements of the proviso to § 2 (b). The dissent did not argue that the agreement in question was within the contemplation of any state regulatory scheme.

[27] We have no occasion here to decide whether the element of state regulatory direction or authorization of the particular practice, absent in this case, is a factor to be considered in the definition of "boycott" within the meaning of § 3 (b), or whether it comes into play as part of a possible

Our ruling does not alter § 2 (b)'s protection of state regulatory and tax laws, its recognition of the primacy of state regulation, or the limited applicability of the federal antitrust laws generally "to the extent that" the "business of insurance" is not regulated by state law. Moreover, conduct by individual actors falling short of concerted activity is simply not a "boycott" within § 3 (b). Cf. *Times-Picayune* v. *United States,* 345 U. S., at 625. Finally, while we give force to the congressional intent to preserve Sherman Act review for certain types of private collaborative activity by insurance companies, we do not hold that all concerted activity violative of the Sherman Act comes within § 3 (b). Nor does our decision address insurance practices that are compelled or specifically authorized by state regulatory policy.

The judgment of the Court of Appeals therefore is

*Affirmed.*

MR. JUSTICE STEWART, with whom MR. JUSTICE REHNQUIST joins, dissenting.

Section 2 (b) of the McCarran-Ferguson Act provides that the Sherman Act "shall be applicable to the business of insurance to the extent that such business is not regulated by State Law."[1] Section 3 (b) limits the antitrust immunity

defense under the "state action" doctrine, as elaborated in *Parker* v. *Brown,* 317 U. S. 341 (1943), and its progeny.

[1] Section 2 provides in full:

"(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal

which the States may confer by providing that the Sherman Act shall remain applicable to agreements or acts of "boycott, coercion, or intimidation." [2]   Today the Court holds that the term "boycott" found in § 3 (b) should be given the same broad meaning that it has been given in Sherman Act case law. It seems clear to me, however, that the "boycott, coercion, or intimidation" language of § 3 (b) was intended to refer, not to the practices defined and condemned by the Sherman Act, but to the narrower range of practices involved in *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533, the case that prompted Congress to enact the McCarran-Ferguson Act.

## I

The Court accurately reads the Act as not conferring broad-scale antitrust immunity on the insurance industry, at least not for practices that "occurred outside of any regulatory or cooperative arrangement established by the laws of Rhode Island." *Ante,* at 553.   Although Congress plainly intended to give the States priority in regulating the insurance industry, it just as plainly intended not to immunize that industry from federal antitrust liability "to the extent that such business is not regulated by State Law." [3]   In thus construing the Act's

---

Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State Law." 59 Stat. 34, as amended, 61 Stat. 448, 15 U. S. C. § 1012 (1976 ed.).

[2] Section 3 provides in full:

"(a) Until June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, and the Act of June 19, 1936, known as the Robinson-Patman Anti-Discrimination Act, shall not apply to the business of insurance or to acts in the conduct thereof.

"(b) Nothing contained in this chapter [Act] shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." 59 Stat. 34, as amended, 61 Stat. 448, 15 U. S. C. § 1013 (1976 ed.).

[3] See n. 1, *supra,* and n. 4, *infra.*

general purpose, the Court is true to the legislative history. But I cannot understand why the Court then tries to achieve that statutory purpose by giving an unduly expansive reading to § 3 (b), when the provision that obviously was meant to accomplish that purpose was § 2 (b). Properly read, § 2 (b) suspends the federal antitrust laws only to the extent that an area or practice is regulated by state law.[4] Although the

---

[4] In the present case the District Court in an oral opinion held that various Rhode Island laws, including state antitrust statutes, made the federal antitrust laws generally inapplicable to the petitioners under § 2 (b). That ruling was implicitly accepted by the Court of Appeals, and has not been questioned here. See *ante*, at 540 n. 9.

The legislative history in the Senate indicates that two kinds of state regulation were thought capable of suspending the federal antitrust laws under § 2 (b). See 91 Cong. Rec. 1444 (1945) (remarks of Sen. O'Mahoney). First, a State could enact its own antitrust laws. Senator Murdock explained that "[i]nsofar as [the state laws] fail to cover the same ground covered by the Sherman Act and the Clayton Act, those [federal] acts become effective again" after the moratorium. *Ibid.* Second, a State could enact laws regulating various aspects of the business of insurance, such as rates and terms of coverage. Senator Ferguson explained that "if the States were specifically to legislate upon a particular point, and that legislation were contrary to the Sherman Act, the Clayton Act, or the Federal Trade Commission Act, then the State law would be binding." *Id.*, at 1481. See also *id.*, at 1443 (remarks of Sen. McCarran and of Sen. Ferguson); *id.*, at 1444 (remarks of Sen. White).

This Court has had few occasions to consider the operation of § 2 (b). In *SEC* v. *National Securities, Inc.*, 393 U. S. 453, the Court held that certain Arizona regulations protecting insurance company stockholders did not regulate the "business of insurance" within the meaning of § 2 (b) and thus did not pre-empt the Securities Exchange Act of 1934. The case did not involve the antitrust proviso of § 2 (b), and hence did not decide to what extent a State must regulate the "business of insurance" to pre-empt the federal antitrust laws.

*FTC* v. *National Casualty Co.*, 357 U. S. 560, is the only case in this Court involving that question. There, the Court held that state statutes "prohibiting unfair and deceptive insurance practices," *id.*, at 562, pre-empted Federal Trade Commission regulations "prohibiting respondent insurance companies from carrying on certain advertising practices found by the Commission to be false, misleading, and deceptive, in violation

Court correctly notes that § 2 (b) "is not in issue in this case," *ante,* at 540, neither section can be construed entirely independently of the other.

The broad reading the Court gives to § 3 (b) seems to me not only to misconceive the larger design of the Act, but also to distort its basic purpose. Section 3 (b) is an absolute exception to § 2 (b). It brings back under the Sherman Act a range of practices, whether authorized by state law or not.[5] By construing § 3 (b) very expansively, the Court narrows the field of regulation open to the States. Yet it was clearly Congress' intent to give the States generous license to govern the business of insurance free of interference from the antitrust laws.

Because I believe that the Court's construction of § 3 (b) overlooks the role of § 2 (b) and misperceives congressional intent, I respectfully dissent.

## II

It is true, as the Court says, that the McCarran-Ferguson Act fails to tell us in so many words that the phrase "boycott, coercion, or intimidation" should be read in some light other than that "tradition of meaning, as elaborated in the body of decisions interpreting the Sherman Act." *Ante,* at 541. Yet, the very selection of precisely those three words from the entire antitrust lexicon indicates that they were intended to

---

of the Federal Trade Commission Act . . . ." *Id.,* at 561–562. Noting that no one had alleged that the state regulation was "mere pretense," the Court rejected the FTC's argument that the state regulation was "too 'inchoate' to be 'regulation' until [the State's statutory] prohibition has been crystallized into 'administrative elaboration of these standards and application in individual cases.'" *Id.,* at 564.

[5] In Senator Ferguson's words:

"There are certain things which a State cannot interfere with. It cannot interfere with the application of the Sherman Act to any agreement to boycott, coerce, or intimidate, or an act of boycotting, coercion, or intimidation." 91 Cong. Rec. 1443 (1945).

have some special meaning apart from traditional usage. Indeed, if "boycott" is to be given the same scope it has in Sherman Act case law, then so should "coercion" and "intimidation." But that reading of § 3 (b) would plainly devour the broad antitrust immunity bestowed by § 2 (b).[6] Congress could not logically have intended that result. To understand the special sense in which it used the words "boycott, coercion, or intimidation," therefore, we must turn to the legislative history of the McCarran-Ferguson Act.

On November 20, 1942, the Justice Department secured an indictment against a private association of stock fire insurance companies and 27 individuals for alleged violations of §§ 1 and 2 of the Sherman Act. The prosecution came as a surprise to many, because Supreme Court precedents dating back 75 years had implied that the insurance industry was not a part of interstate commerce subject to congressional regulation under the Commerce Clause.[7] On this ground, the District Court sustained the defendants' demurrer to the indictment on August 15, 1943,[8] and the Government took an appeal directly to the Supreme Court.

Uncertain about the continuing validity of many state regulations that conflicted with federal law, various insurance companies and organizations immediately sought relief from Congress. Some threatened to withhold state taxes on the ground that States were then thought to be prohibited from

---

[6] Most practices condemned by the Sherman Act can be cast as an act or agreement of "boycott, coercion, or intimidation." For example, price fixing can be seen either as a refusal to deal except at a uniform price (*i. e.,* a boycott), or as an agreement to force buyers to accept an offer on the sellers' common terms (*i. e.,* coercion). Yet state-sanctioned price fixing immunized by § 2 (b) was plainly not intended to fall within the § 3 (b) exception. See 91 Cong. Rec. 1481 (1945) (remarks of Sen. Ferguson).

[7] See H. R. Rep. No. 143, 79th Cong., 1st Sess., 2 (1945).

[8] *United States* v. *South-Eastern Underwriters Assn.,* 51 F. Supp. 712 (ND Ga.).

taxing interstate commerce.[9] These threats prompted state officials to press for congressional action too. Months before the Supreme Court even heard arguments in the case, duplicate bills had been introduced in both Houses of Congress which would have given the insurance industry blanket immunity from the Sherman and Clayton Acts.[10] A joint congressional committee held extensive hearings from September 1943 into June 1944, but a vote on the bills was delayed until after the Court announced its decision.

That decision came on June 5, 1944. The Court held that the business of insurance is part of interstate commerce, and that the Congress which enacted the Sherman Act had not intended to exempt that industry. *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533. Of particular relevance to our inquiry is the Court's description of the unlawful activities alleged in the *South-Eastern Underwriters* indictment:

> "The member companies of S. E. U. A. controlled 90 per cent of the fire insurance and 'allied lines' sold by stock fire insurance companies in the six states where the conspiracies were consummated. Both conspiracies consisted of a continuing agreement and concert of action effectuated through S. E. U. A. The conspirators not only fixed premium rates and agents' commissions, but employed boycotts together with other types of coercion and intimidation to force nonmember insurance companies into the conspiracies, and to compel persons who needed insurance to buy only from S. E. U. A. members on S. E. U. A. terms. Companies not members of S. E. U. A. were cut off from the opportunity to reinsure their risks, and their services and facilities were disparaged; independent sales agencies who defiantly represented non-

---

[9] See H. R. Rep. No. 143, *supra,* at 2.

[10] H. R. 3270, S. 1362, 78th Cong., 1st Sess. (1943).

S. E. U. A. companies were punished by a withdrawal of the right to represent the members of S. E. U. A.; and persons needing insurance who purchased from non-S. E. U. A. companies were threatened with boycotts and withdrawal of all patronage." *Id.*, at 535–536 (footnote omitted).

The Court concluded:

"Few states go so far as to permit private insurance companies, without state supervision, to agree upon and fix uniform insurance rates. . . . No states authorize combinations of insurance companies to coerce, intimidate, and boycott competitors and consumers in the manner here alleged, and it cannot be that any companies have acquired a vested right to engage in such destructive business practices." *Id.*, at 562.

Before announcement of the Court's opinion, the phrase "boycott, coercion, or intimidation" had appeared in none of the lengthy debates or numerous legislative proposals in Congress from September 1943 to May 1944.

The bill totally exempting the insurance industry from the Sherman and Clayton Acts passed the House of Representatives on June 22, 1944.[11] Although a majority of the Senate Committee recommended enactment of the House bill,[12] six members urged that the Senate not pass the bill but wait for the legislative proposal then being drafted by the National Association of Insurance Commissioners, an organization of state officials.[13] The Senate let the House bill die that session,[14] and the Committee turned its attention to the recommendation of the state insurance commissioners.

The state officials proposed a statute that, after a mora-

---

[11] 90 Cong. Rec. 6510 (1944).
[12] S. Rep. No. 1112, 78th Cong., 2d Sess. (1944).
[13] *Id.*, pt. 2, at 6.
[14] 90 Cong. Rec. 8054 (1944).

torium period of several years, would have exempted from the Sherman Act a specific list of cooperative practices.[15] The proposed statute also provided: "Nothing contained in this section shall render the said Sherman Act inapplicable to any act of boycott, coercion, or intimidation." [16] The accompanying report explained the operation and the relationship of these two provisions: [17]

"A suspension until July 1, 1948, is requested, in which the Sherman and Clayton Acts shall not apply, in order to allow adjustments within the business and time for enactment by States of such further legislation as they may deem necessary or desirable. After July 1, 1948, it is provided that the Sherman Act shall not apply to the use of cooperative rates, forms, and underwriting plans where State-approved, to adjustment, inspection and similar agreements[,] to acts of reinsurance or co-insurance, to commission agreements, to the collection of statistics, nor to cooperative action for making of rates, rules, or plans where their use is not mandatory.

---

[15] *Id.*, at A4406.

[16] *Ibid.*

[17] The report also appeared to reflect the testimony of Attorney General Biddle, who, on the day after H. R. 3270, see n. 10 *supra*, passed the House, appeared before the Senate Judiciary Subcommittee that was considering this same legislation. He assured the Subcommittee that the Government did not intend to bring new prosecutions while Congress was considering legislation on the subject, but he insisted that the *South-Eastern* case should and would go forward because of the seriousness of the charges. After quoting a portion of the Court's opinion set out in the text, *supra*, at 560–561, he stated:

"[T]hat case was not merely a price-fixing case, but involved very serious boycotting. It involved boycotting by insurance companies of agents who would not belong to the association, and under the laws of the State in which the association operated, many of the acts alleged in the indictment would have been illegal." Joint Hearing on S. 1362 et al. before the Subcommittees of the Committees on the Judiciary, 78th Cong., 2d Sess., 636 (1944).

"No exemption is sought nor expected for oppressive or destructive practices. . . . Provision is made that the Sherman Act shall not now or hereafter be inapplicable to any act of boycott, coercion, or intimidation." 90 Cong. Rec. A4406 (1944).

This proposal formed the basis for S. 340, which was reported out with the unanimous support of the Senate Committee on the Judiciary in January 1945.[18] The list of specific practices immunized from antitrust liability was dropped, leaving the provision that suspended the Clayton and Sherman Acts for several years, during which time the States could accommodate their regulatory activities to the federal antitrust laws.[19] Even during the moratorium, however, the Sherman Act was to remain applicable to "any act of boycott, coercion, or intimidation." [20] This provision was not needed

[18] S. Rep. No. 20, 79th Cong., 1st Sess. (1945).

[19] In the floor debates, several Senators pointed out that the bill could be read to support pre-emption of the federal antitrust laws by state regulations. 91 Cong. Rec. 480 (1945). To clarify its intent, the Senate amended S. 340 on the floor to make the antitrust laws expressly and fully applicable after the moratorium period. *Id.*, at 488.

[20] As the bill came out of committee, the boycott provision applied only to the section establishing a short-term moratorium. *Id.*, at 479. A proposal to extend the boycott provision to the full Act was offered by Senator Murdock and accepted by Senator Ferguson, *ibid.*, but was never ratified by the Senate.

That the boycott exception was originally drafted only to keep the Sherman Act partially in effect during the moratorium suggests that the provision may have been initially intended to prevent interference with the prosecution of the defendants in *South-Eastern Underwriters*, who still faced trial following the decision of this Court. Certainly, many Congressmen expressed their opposition to legislation that would free those defendants from liability. See, *e. g.*, 90 Cong. Rec. 6450 (1944) (remarks of Rep. Celler); *id.*, at 6452 (remarks of Rep. LaFollette); Joint Hearings, *supra* n. 17, at 637 (remarks of Sen. Hatch). On its face, the boycott provision removed any doubt about the Government's authority to continue with that prosecution. Whatever its initial impetus, however, there

after the moratorium because the antitrust laws would take full effect after that time. Thus, the Senate bill as finally passed made federal antitrust policy paramount to state regulation.

The House passed a version of the bill striking the opposite balance. Its bill, too, carried a moratorium provision with the boycott limitation, but at the end of that period the federal antitrust laws would be pre-empted by state regulations even insofar as acts of "boycott, coercion, or intimidation" were concerned.[21]

A Conference Committee then within a short period worked out a compromise bill which became the present McCarran-Ferguson Act. Section 2 (b) of this bill steered a middle course by making the Sherman Act, the Clayton Act, and the Federal Trade Commission Act applicable to the business of insurance after a moratorium period, but only "to the extent that such business is not regulated by State law." [22] At the same time, the "boycott, coercion, and intimidation" limitation on the States' power to confer antitrust immunity was extended beyond the moratorium period to the full life of the Act.[23]

## III

From this review of the legislative history, it should be clear that the scope given both §§ 2 (b) and 3 (b) is crucial to the effectuation of the compromise struck by the 79th Congress. If § 2 (b) is construed broadly to pre-empt federal law without the need for specific state legislation and if § 3 (b) is given no effect as a limitation on that pre-emption, the original House position prevails. On the other hand, if § 3 (b) is construed as broadly as the Sherman Act itself, then the original Senate version largely prevails, no matter how § 2 (b) is interpreted.

---

is no indication that the provision was finally thought to be applicable only to the *South-Eastern* litigation.

[21] See 91 Cong. Rec. 1085 (1945); see also *id.*, at 1484–1485.

[22] See n. 1, *supra.*

[23] See n. 2, *supra.*

Congress clearly intended a middle position between these extremes. That position cannot be given effect unless § 2 (b) is read to pre-empt federal law only to the extent the States have actually regulated a particular area, and § 3 (b) is viewed as referring to a range of evils considerably narrower than those prohibited by the Sherman Act.

From the legislative debates on S. 340, the Committee Reports, and the design of the statute itself, it is evident that the "boycott, coercion, or intimidation" provision is most fairly read as referring to the kinds of antitrust violations alleged in *South-Eastern Underwriters*—that is, attempts by members of the insurance business to force other members to follow the industry's private rules and practices. Repeatedly, Congressmen involved in the drafting of the statute drew a distinction between state regulation and private regulation.[24] Congress plainly wanted to allow the States to authorize anticompetitive practices which they determined to be in the public interest, as indicated by formal state approval.[25] Section 2 (b) does just that. Congress just as plainly wanted to make sure that private organizations set up to govern the industry, such as the South-Eastern Underwriters Association, would not escape the reach of the federal antitrust laws. Section 2 (b) also meets this concern to the extent that States do not authorize or sanction anticompetitive practices promoted by such organizations. But § 2 (b) leaves open the possibility that States might, at the prompting of these powerful organizations, enact merely permissive regulations sufficiently specific to confer antitrust immunity, thus leaving those organizations free to coerce compliance from uncooperative competitors. Properly construed, § 3 (b) fills this gap by keeping the Sherman Act fully applicable to *private enforcement*—by the means described in the *South-Eastern*

---

[24] See, *e. g.,* 91 Cong. Rec. 1480, 1483, 1485 (1945) (remarks of Sen. O'Mahoney); *id.,* at 1481 (remarks of Sen. Ferguson).

[25] See *id.,* at 1486 (remarks of Sen. O'Mahoney).

*Underwriters* case—of industry rules and practices, even if those rules and practices are permitted by state law.[26] Similarly, where a State enacts its own antitrust laws conferring § 2 (b) immunity, § 3 (b) retains Sherman Act coverage for those especially "destructive . . . practices," 322 U. S., at 562, involved in *South-Eastern Underwriters.*

The key feature of § 3 (b), then, is that the agreement or act of "boycott, coercion, or intimidation" must be aimed ultimately at a member of the insurance industry. As in *South-Eastern Underwriters,* the immediate targets may be policyholders or others outside the industry, but unless they are boycotted, coerced, or intimidated for the purpose of forcing other insurance companies or agents to comply with industry rules, § 3 (b) does not apply.

It follows, then, that § 3 (b) does not reach the boycott alleged in this case. The respondents' complaint does not contend that petitioner insurance companies refused to sell them insurance with the ultimate aim of disciplining or coercing other insurance companies. Rather, if there was an agreement among the petitioners, the complaint would indicate that it was entirely voluntary.

I would reverse the judgment of the Court of Appeals.

---

[26] See *id.,* at 1485–1486 (remarks of Sen. O'Mahoney).