UNR INDUSTRIES, INC., et al., Plaintiffs,

v.

CONTINENTAL INSURANCE COMPANY, et al., Defendants.

No. 83 A 2523.

United States District Court, N.D. Illinois, E.D.

April 9, 1985.

Michael J. Gallagher, D. Patterson Gloor, Cassiday, Schade & Gloor, Chicago, Ill., for Bituminous Coal.

Michael E. Dowd, Dowd & Dowd, Ltd., Chicago, Ill., for Northbrook Excess and Surplus Ins. Co.

Philip C. Stahl, Donald Vogelsang, Reuben & Proctor, Chicago, Ill., for Nat. Sur. Corp. and Fireman's Fund Ins. Co.

Perry L. Fuller, Robert E. Nord, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for Continental Cas. Ins. Co.

Patrick W. O'Brien, Kenneth J. Jurek, Mayer, Brown & Platt, Chicago, Ill., for Ins. Service Office, Inc.

Merrill C. Hoyt, Thomas L. Aries, Aries, Hoyt & Williams, Chicago, Ill., for Continental Ins. Co. and Underwriters Adjusting Co.

Lloyd E. Williams, Jr., Anthony P. Katauskas, Jacobs, Williams & Montgomery, Chicago, Ill., for Commercial Union Ins. Co.

John G. Jacobs, Plotkin & Jacobs, Chicago, Ill., Stuart Parker, Siff & Newman, P.C., New York City, for American Mut. Liability Co.

Peter C. John, Phelan, Pope & John, Louis Levit, Levit & Mason, Ltd., Chicago, Ill., for Zurich Ins. Co.

William F. Ryan, Michael J. Sehr, Haskell & Perrin, Chicago, Ill., for Home Ins. Co.

Stanley B. Block, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for Continental Ins. Co. and Underwriters Adjusting Co.

Sherman I. Goldberg, First National Bank of Chicago Law Dept., Chicago, Ill.

J. William Cuncannan, Defrees & Fiske, Chicago, Ill., for Official Creditors Committee.

George P. Von Schaumburg, Securities & Exchange Comm., Chicago, Ill.

Susan Pierson DeWitt, U.S. Trustee, Chicago, Ill.

Malcolm M. Gaynor, Schwartz, Cooper, Kolb & Gaynor, Chicago, Ill., Joseph J. O'Malley, Ronald A. Oster, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., Michael Horton, c/o Mark D. Romness, UNR Industries, Inc., Chicago, Ill., for debtor.

Dennis Diczok, Citibank, New York City.

John S. Belisle, Manufacturer's Hanover Trust Co., New York City.

Daniel J. Pope, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for American Re-Insurance Co.

Thomas C. Walker, James E. O'Halloran, Jr., O'Halloran, Lively & Walker, Northbrook, Ill., for Corroon & Black of Illinois, Inc.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

Presently before the court is UNR's motion for leave to file a second amended complaint. This motion was filed one month after this court's opinion of November 30, 1984, 607 F.Supp. 855, (N.D.Ill.1984) ("November 30 Opinion") which, among other things, dismissed the antitrust claims (counts 1 and 2) of UNR's first amended complaint. Other counts in UNR's complaint seek recovery for the same conduct complained of in those dismissed counts, but the November 30 Opinion had the effect of removing the only federal-law claims and the possibility of recovering treble damages.

■■■ UNR's second amended complaint would add three new counts, all based on the same set of facts and against the same defendants. Proposed count 1, a revised

version of the previously dismissed count 1,[1] claims that section 1 of the Sherman Act, 15 U.S.C. § 1, was violated when UNR was prevented from participating as a consumer in the insurance market by a conspiracy between three of UNR's insurers and Corroon and Black ("C & B"), UNR's insurance broker at the relevant times. Proposed count 2 alleges that those same acts violated the RICO statute, 18 U.S.C. §§ 1961–1968, because they constituted a scheme to defraud UNR which was conducted at least in part through mail and wire communication in violation of the mail and wire fraud laws, 18 U.S.C. §§ 1341 and 1343. Finally, proposed count 15 alleges C & B's misconduct described in proposed count 1 violated the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, par. 262.

## I. Standards Governing Request to Amend

Rule 15(a) of the Federal Rules of Civil Procedure provides that when a party seeks leave to amend a pleading "leave shall be freely given when justice so requires." In *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), the Court stated:

> [T]his mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. —the leave sought should, as the rules require, be 'freely given.'

Here, defendants assert that three factors—undue delay, undue prejudice, and futility of amendment—each are present and any one of them sufficient to deny leave to amend. UNR claims, and defendant C & B apparently concedes, that undue delay is not a sufficient reason by itself but must be accompanied by undue prejudice. To resolve this dispute and to better articulate the discretion vested in this court, *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971), an examination of the interrelationship of those three factors is necessary.

The wording used in the *Foman* case ("In the absence of *any* apparent or declared reason") suggests that any one of the reasons listed by the Supreme Court, including undue delay, is sufficient to justify denying leave to amend. Until recently the Seventh Circuit seemed to agree. *See Jafree v. Barber,* 689 F.2d 640, 644 (7th Cir.1982); *United States Labor Party v. Oremus,* 619 F.2d 683, 692 (7th Cir.1980). In *Textor v. Board of Regents,* 711 F.2d 1387, 1391 (7th Cir.1983), however, the court stated that "[d]elay in presenting the amendment will be a sufficient basis for denial of leave to amend only when the delay has caused the opposing party undue prejudice." Though relying solely on 6 Wright & Miller, Federal Practice and Procedure § 1488 (1971) for what amounts to an implicit reversal of the *Oremus* case, the statement in *Textor* does find support in several cases from this district. *Issen v. GSC Enterprises,* 522 F.Supp. 390, 394 (N.D.Ill.1981); *Farr v. United Airlines, Inc.,* 84 F.R.D. 618, 620 (N.D.Ill.1979); *A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Corp.,* 68 F.R.D. 383, 385 (N.D.Ill.1975); *Ozark Air Lines, Inc. v. Delta Air Lines, Inc.,* 63 F.R.D. 69, 72 (N.D.Ill.1974). Contra, *Skokie Gold Standard Liquors, Inc. v. Joseph E. Sea-*

---

**1.** Proposed count 1 retains the allegations relating to the "retroactive price fixing and unlawful deprivation of insurance benefits" theory made in count 1 of the first amended complaint. However, this court specifically rejected that theory in the November 30 Opinion, and amend-

ing the complaint is not a device for reinstating previously dismissed claims. *Wakeen v. Hoffman House, Inc.,* 724 F.2d 1238, 1244 (7th Cir. 1983); *Miller v. Steinbach,* 43 F.R.D. 275, 277 (S.D.N.Y.1967). Therefore, those allegations will be ignored.

*gram & Sons, Inc.*, 99 F.R.D. 108, 109 (N.D.Ill.1983).

From *Textor* this court concludes that delay and prejudice are tied together in a way similar to the sliding scale approach to preliminary injunctions adopted in *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387–88 (7th Cir.1984). That is, while delay itself is never sufficient, the longer a party has delayed in bringing the amendment, the less prejudice the other party must show to justify denying leave to amend.[2] That interpretation appears to reconcile *Foman* and *Textor*, is hinted at in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 353–54 (7th Cir.1981); and *Kirby v. P.R. Mallory & Co.*, 489 F.2d 904, 912 (7th Cir.1973), and is supported by the following considerations. First, a party who inexcusably delays in seeking leave to amend is in effect holding back and only playing his cards when necessary to avoid defeat. That approach is contrary to the policy of the federal rules in favor of "the just, speedy and inexpensive determination of every action." Fed.R.Civ.P. 1. If the other party can point to no prejudice that would be suffered by allowing the amendment, then *Textor* can be taken as saying that denying leave would be too harsh a punishment to visit on a party whose only "victim" is the system of justice generally. *See also Carson v. Polley*, 689 F.2d 562, 584 (5th Cir.1982) ("Merely because a claim was not presented as promptly as possible, however, does not vest the district court with authority to punish the litigant"). However, if the inexcusable delay has caused the other party some prejudice, then depending on the degree of delay and prejudice, denying leave to amend may be what justice requires.

That leaves "futility of amendment" to consider. Where it is clear that an amendment would be futile (as, e.g., where it would not survive a motion to dismiss) then quite apart from any considerations of delay or prejudice leave should be denied to avoid doing a "futile thing," *Textor*, 711 F.2d at 1391 n. 1. (Denying leave in those circumstances would not contravene the policy, *see Green v. J.C. Penney Auto Insurance Co.*, 722 F.2d 330, 333 n. 3 (7th Cir.1983), in favor of deciding cases on their merits, since a futile amendment has no merit). Even an amendment that would survive a motion to dismiss is properly barred "in those instances where the prejudice outweighs the right to have the case tried on the merits." *Hess v. Gray*, 85 F.R.D. 15, 20 (N.D.Ill.1979). *See also Wakeen v. Hoffman House, Inc.*, 724 F.2d 1238, 1244 (7th Cir.1983) (movant must show that a proposed amendment has "substantial" merit). Thus, the more merit a proposed amendment has, the stronger the countervailing factors (such as prejudice and delay) must be to justify denying leave.

### A. Degree of Prejudice

The first sort of prejudice defendants claim will result from granting leave to amend is that they would have to file and brief a second round of "laborious and costly" motions to dismiss. (Defendants also seem to argue this court would be prejudiced by having to deal with the new claims and new motions to dismiss them, but of course that is not a consideration here.) Accepting that as "undue" prejudice, however, would effectively nullify Rule 15(a) since nearly every amendment requires the parties to analyze and in some manner respond to new claims or allegations.

C & B argues that it will be particularly prejudiced by the recent and unex-

---

**2.** Of course, undue prejudice alone could in some circumstances justify denying leave to amend. A finding of undue prejudice is the same as finding that allowing the amendment would be unjust to defendants. The command in Rule 15(a) to do as justice requires implies that in some cases leave to amend must be denied even though the plaintiff has moved promptly because the prejudice to the defendant will be so great that on the whole allowing the amendment would work an injustice.

pected death of David Leavitt, UNR's chief executive officer, because that person had discussions with Morton Gainer, the broker at C & B who handled the UNR account, concerning the availability and cost of insurance during the relevant time period. Relying on *Boris v. Moore,* 253 F.2d 523 (7th Cir.1958), C & B argues that the unavailability of Leavitt precludes it from questioning Leavitt on the proposed amended counts. That of course is true, but the prejudice is not so extreme as C & B claims. As UNR points out, Leavitt had previously testified that he left insurance matters to Robert Penn, UNR's president, and that he himself rarely met with C & B's agents. This situation is therefore different from *Boris,* in which the person who died after the action was commenced but before amendment was sought was the only person from whom the party claiming prejudice could have obtained any evidence regarding the amended claim. Therefore, that prejudice must be taken into account but is small.

Defendant next argues that the proposed amendments would require much new discovery, some of it duplicative, and would delay final disposition of the case. As defendants point out, adding C & B as a new and crucial partner in the alleged conspiracy will require discovery into the kind and degree of contact between C & B and the other alleged conspirators, facts which previously were of secondary importance at best. Defendants do not attempt to quantify this new discovery, but the number of potential witnesses, the length of time involved, and the number of meetings among witnesses strongly suggest it would be substantial. On the other hand, the proposed general discovery plan indicates discovery is only about half finished, and how long if at all the trial would be delayed by

allowing the amendments is difficult to determine.

A possible solution in these circumstances is to try to cure any prejudice to defendants by charging UNR for the diseconomies created by its tardiness. *See Ovitz v. Jefferies & Co., Inc.,* 102 F.R.D. 242 (N.D. Ill.1984). That approach would not work here, however. Obviously, that solution would do nothing to cure C & B's inability to examine David Leavitt on the new allegations. More important, the nature of this case makes it unlikely that the amount representing expenses attributable to UNR's tardiness could be determined without in turn incurring substantial (and perhaps greater) expense. Finally, this court is unwilling to impose any such costs on this estate unless they are outweighed by the benefits involved. This court's primary duty is to conserve the estate and it will not allow "speculation" in litigation that does not promise any reasonable "return."

### B. Degree of Delay

Defendants assert that UNR has no valid excuse for seeking to amend some 15 months after this case began and after a decision on extensive motions to dismiss. UNR counters that the new counts are based on evidence just recently discovered, but that excuse does not withstand scrutiny. Only two of the allegations in the proposed amendments are new in the relevant sense.[3] The first allegation is that C & B's representation to UNR that C & B had shopped around but only defendant Continental Insurance Company ("Continental") would insure UNR was false. The claimed "new" evidence supporting that allegation was known no later than June 28, 1984, when Gainer and Bruce O'Neill, two of C & B's agents, gave deposition testimony suggesting C & B did not shop around

---

**3.** Most of the 46 exhibits UNR submitted with its brief in support concern the defendant insurers' own interpretations of the duties imposed on them by their policies with UNR, C & B's knowledge of those duties, and the cooperation among defendant insurers in getting UNR to

contribute some of the costs of defending asbestos claims. Those exhibits cannot explain UNR's delay because they are merely cumulative evidence for contentions UNR has made all along, and not "new" evidence without which

(exhibits 33 and 34).[4] Allowing a generous 2 months for preparation of the proposed amendments, that still leaves an unexcused delay of about 3 months during which motions to dismiss the first amended complaint were before the parties and the court. And as defendants point out, UNR must have known sufficient facts to support that allegation when the first amended complaint was filed since essentially the same allegation is found in paragraph 144(c) of the first amended complaint, where UNR alleges that C & B "failed to disclose to UNR the availability of general product liability and product liability insurance policies on terms more favorable to UNR than those which [C & B] advised UNR to purchase," and because UNR had access, prior to filing the first amended complaint, to C & B's files and personnel regarding the UNR account and at that time was told that C & B could not locate any documents showing C & B had tried to place insurance with any company other than defendant Continental Insurance Company for the 1976 policy year (see exhibit 6 attached to C & B's answer brief).

The second new allegation is that C & B made the above misrepresentation as part of an agreement it had with the defendant insurers to keep UNR from taking its insurance business elsewhere. The most recent "new" evidence supporting that allegation was known by June 29, 1984, when Gainer testified that all the agreements with the defendant insurers concerning new policies and coverage under old policies "had to be worked out in a coordinated manner so it would mesh" (exhibit 41). However, as will be discussed later, that statement is weak, if any, evidence for UNR's conspiracy claim and therefore adds little, if anything, to alleged facts UNR knew before filing its original complaint: that C & B was negotiating with the defendant insurers (sometimes meeting with all of them simultaneously) to work out a deal on past and future coverage and failed to protect UNR's interests in those negotiations. The court concludes that if UNR ever had enough evidence to justify charging that C & B conspired with the defendant insurers to prevent UNR from shopping elsewhere for insurance, UNR had enough when it filed its first complaint. Therefore, UNR inexcusably delayed its request to amend by some 15 months.

### C. Merit of Proposed Amendments

#### 1. Count 1: Antitrust Claim

Proposed count 1 claims that UNR was prevented from participating as a consumer in the insurance market by a conspiracy between three of UNR's insurers and C & B, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. UNR alleges that C & B represented to UNR that C & B had shopped around and discovered no one but defendant Continental (who had been UNR's carrier since 1970) would provide products liability coverage of any kind to UNR for 1976. In fact, UNR alleged, C & B had not shopped around at all, and "insurance companies other than Continental were providing coverage to asbestos manufacturers in 1976 and thereafter, and insurance companies other than Continental were available to write non-asbestos coverage for UNR in 1976 and thereafter" (par. 30(b)).[5] UNR claims that C & B's misrepresentations were made to induce UNR to renew its policy with Continental on Continental's terms (which included eliminating some of the benefits UNR was allegedly entitled to under its previous policies) and that the result of C & B's misrepresentations was to prevent UNR from dealing with other insurance companies.

Since proposed count 1 is an attempt to supply the anticompetitive ef-

---

UNR could not have filed the proposed amendments.

**4.** Unless otherwise specified, all references to exhibits are to those accompanying UNR's supporting brief.

**5.** UNR also alleges that C & B failed to disclose that UNR was entitled to a full defense and full indemnity under its 1970–1975 policies with Continental, but that allegation has no bearing on the claim that UNR was prevented from entering the market for *future* policies and thus is irrelevant to the alleged antitrust violation.

fect the November 30 Opinion found lacking in count 1 of the first amended complaint, the first question is whether UNR has succeeded. UNR argues the allegations concerning C & B show that "defendants prevented UNR from dealing with any insurance company but Continental, thereby eliminating all competition for UNR's purchase of future insurance" (reply brief at 5). However, a showing of anticompetitive effect requires that the relevant market be established.[6] *Vogel v. American Society of Appraisers,* 744 F.2d 598, 604 (7th Cir.1984). UNR does not allege that it "represents the entire market" for products liability insurance, *Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 559 n. 6 (7th Cir.1980), and therefore harm to UNR does not show harm to the "market." Rather, "there must be some allegation of a harmful effect on a more generalized market than [UNR]." *Id.* at 558. What UNR is really alleging is not that competition in the insurance market was impaired[7] but that it, and it alone, was prevented from taking advantage of that competition. But the loss by a single buyer (UNR) of a single insurance contract (i.e., the one UNR presumably would have purchased from some other insurer if it had known it could) is no more "equivalent to a deleterious effect on the market" than the "loss by [a seller] of a single contract with a single purchaser." *Id.* As stated in *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985), "[t]he purpose of the Sherman Act is to rectify the injury to consumers caused by diminished competition . . . [and t]hus, the plaintiff must allege, not only an injury to himself, but an injury to the market as well." Though the plaintiff in that case was a competitor rather than a consumer,

the statement applies equally here. The Sherman Act does not protect the well-being of any particular consumer, it protects the institution of the "market," and here, according to UNR's own allegations, that institution was in good health. As was true of count 1 of the first amended complaint, proposed count 1 "alleges no competitive injury in the antitrust sense; defines no market; refers to no market-wide anticompetitive effects, actual or probable." *Sutliff, Inc. v. Donovan Companies,* 727 F.2d 648, 655 (7th Cir.1984). UNR has alleged no more than ordinary business torts to which the Sherman Act does not apply. *Id.*

Based on the foregoing, the court concludes that proposed count 1 fails to state a claim and adding it to the complaint would be wholly futile. Leave to amend the complaint to add count 1 is therefore denied.

### 2. Count 2: RICO Claim

Relying on essentially the same facts alleged in count 1, UNR alleges those facts constitute a violation of the RICO statute, 18 U.S.C. § 1961, *et seq.* The elements of a civil RICO claim are well set forth in *Haroco v. American Nat. Bank & Trust Co.,* 747 F.2d 384, 386 (7th Cir.1984), *cert. granted,* — U.S. ——, 105 S.Ct. 902, 83 L.Ed.2d 917 (1985), and here it suffices to note that for the "enterprise" requirement UNR alleges the defendants were "associated in fact" (§ 1961(4)), and that for the predicate acts of racketeering activity UNR alleges that defendants used the mails and wires to further their scheme to defraud UNR, thus violating the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.

The first of defendants' two arguments against count 2 is that it fails to plead the fraud with specificity as required by Fed.R.Civ.P. 9(b). *See Haroco,* 747 F.2d

---

**6.** UNR does not and could not claim that its allegations constitute a *per se* violation.

**7.** UNR relies on *St. Paul Fire & Marine Insurance Co. v. Barry,* 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978), in which the entire class of insurers agreed that none of them would insure the plaintiffs so that plaintiffs would be forced to accept the kind of insurance one defendant

offered. The Supreme Court described the agreement as "effectively foreclosing all possibility of competition anywhere in the relevant market." *Id.* at 553, 98 S.Ct. at 2935. Here, however, UNR itself alleges that competition existed in the market for products liability insurance, and that is all the antitrust laws were intended to ensure.

at 405 (Rule 9(b) applies to RICO actions). Satisfying Rule 9(b) means describing the "time, place, particular contents of the false representations, the identity of the party making the misrepresentation, and the consequences of the misrepresentation." *Rudolph v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 100 F.R.D. 807, 809 (N.D.Ill.1984). And where, as here, the alleged scheme involves multiple defendants, the complaint "must inform each defendant of the specific fraudulent acts" justifying his inclusion in that count. *D & G Enterprises v. Continental Illinois Nat. Bank,* 574 F.Supp. 263, 267 (N.D.Ill.1983) (quoting *Lincoln Nat. Bank v. Lampe,* 414 F.Supp. 1270, 1278 (N.D.Ill.1976)).

█ UNR points to its descriptions of the use of the mails and claims they satisfy Rule 9(b). Two of those three descriptions, however, are simply irrelevant to this issue. In the first (par. 27(f)), UNR describes an exchange of letters among the defendant insurers that allegedly constituted a record of their agreement dividing UNR's asbestos liability. In the second (par. 29), UNR describes "threats" made by Continental to the effect that unless UNR agreed to the defendant insurers' demands concerning existing policies UNR would get no more insurance from Continental. Regardless of their particularity, neither of these paragraphs describes any fraud, so neither is subject to Rule 9(b), so neither can be used to show UNR has satisfied that rule.

█ UNR also points to par. 30(a) which describes C & B's misrepresentation that only Continental would insure UNR in 1976. This paragraph identifies the time period, the contents of the misrepresentations and the party making them. It does not specify the place, but it is doubtful that minor oversight prevents C & B from being adequately notified of what it is charged with, and in any case the detail otherwise given strongly suggests UNR could also specify the place. As to C & B, therefore, Rule 9(b) is (or easily could be) satisfied.

█ As to the defendant insurers, however, Rule 9(b) is not satisfied. The only misrepresentation arguably attributable to the defendant insurers appears in par. 26(e), which alleges that one of the purposes of defendants' alleged conspiracy was "to mislead UNR as to the availability of coverage under their policies." Nowhere in the proposed count does UNR reveal the time, place, author or content of the allegedly misleading statements, and that is just the sort of vague and conclusory charge of fraud Rule 9(b) is meant to prevent. The proposed amended complaint comes after extensive discovery which should have uncovered the facts, if any existed, to support a charge of misrepresentation by the defendant insurers. Moreover, nowhere in the 46 exhibits UNR submitted in support of allowing its amended complaint is there any evidence even suggesting that any insurer misled UNR as to its coverage, and in fact some of those exhibits indicate that the reason for dividing defense expenses and liability was the belief by all parties that UNR was uninsured for some years (see exhibits 10, 11 and 14–16). As to the defendant insurers, therefore, UNR has not satisfied and could not satisfy Rule 9(b).

█ Defendants also assert that UNR has not successfully plead the existence of an enterprise. "Enterprise" is defined in § 1961(4) as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Where the alleged enterprise is a legal entity, such as a corporation, the enterprise requirement is usually easily satisfied. Here, however, UNR wants the "persons" required by § 1962 to be the several corporate defendants, none of which are legally related. UNR must therefore rely on the association-in-fact type of enterprise, which is a nebulous concept at best. *Haroco,* 747 F.2d at 401. In *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981), the Supreme Court stated that the enterprise "is an entity separate and apart from the pattern of [racketeering] activity in which it

engages," which means that a group of persons or entities is not an enterprise unless it is "associated together for a common purpose of engaging in a course of conduct" that is not identical to the "series of criminal acts" that constitute the "pattern of racketeering." *Id.* It is true that the Second Circuit has held that a RICO enterprise can be "no more than the sum of the predicate racketeering acts," *United States v. Bagaric,* 706 F.2d 42, 55 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983), but that approach effectively reads the requirement of an enterprise out of the statute. This court therefore agrees with the other circuits that "an enterprise cannot simply be the undertaking of the acts of racketeering, neither can it be the minimal association which surrounds these act." *United States v. Bledsoe,* 674 F.2d 647, 664 (8th Cir.), *cert. denied,* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982); *see also Instituto Nacional de Comercializacion Agricola v. Continental Illinois Nat. Bank and Trust Company of Chicago,* 576 F.Supp. 991, 999 (N.D.Ill.1983) (association-in-fact must have "a common purpose, continuity of structure and personnel, and a structure distinct from the pattern of racketeering"); *Saine v. A.I.A., Inc.,* 582 F.Supp. 1299, 1303–06 (D.Col.1984) (summarizing the cases).

■ Arguably, UNR has sufficiently alleged an enterprise. The defendant insurers and C & B are alleged to have dealt with each other for the purpose of working out an agreement concerning the renewal of UNR's product liability insurance and the scope of each insurer's liability to UNR under the previous policies. That gives the fledgling association-in-fact a common purpose and an existence apart from C & B's alleged acts of racketeering. Those negotiations are also alleged to have continued for several years among the same defendants, which gives the association-in-fact continuity of structure and personnel. Now depending on how strict a definition of association-in-fact is adopted UNR may have trouble in its proof. For example, the Third Circuit has held that there must be a showing that a structure exists for group

decision making, whether hierarchical or consensual. *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 789–90 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985); *United States v. Riccobene,* 709 F.2d 214, 222 (3d Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). But at this point it cannot be said that UNR will be unable to produce such proof, if required. Therefore, proposed count 2 adequately alleges the existence of an enterprise.

■ Of course successfully pleading the existence of an enterprise does not produce a RICO claim; UNR must also allege the existence of a liable "person." As already noted, UNR has not adequately pleaded any fraudulent conduct by the defendant insurers. That means that even though the insurers can help make up the association-in-fact through which C & B operated, they cannot be held liable as "persons" under § 1962(c) because there is no allegation that they "participat[ed], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of *racketeering* activity. Moreover, UNR's allegations of conspiracy between C & B and the defendant insurers are wholly conclusory and just the sort of "boilerplate recitation[s]" that would not withstand a motion to dismiss. *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). That means that the defendant insurers are not liable under § 1962(c). Thus, proposed count 2 fails to state a claim against the defendant insurers.

■ As to C & B, however, the RICO count is viable. UNR adequately alleges an enterprise and adequately alleges that C & B conducted the affairs of that enterprise through a pattern of racketeering activity. Therefore, this court must determine whether justice requires that proposed count 2, limited to C & B as the sole defendant, be allowed as an amendment. Allowing this amendment would result in

prejudice to C & B, since it is unable to depose David Leavitt concerning these new charges and would have to undertake substantial new discovery in resisting count 2. Moreover, UNR's request is inexcusably late since it had enough facts to bring this RICO count when it filed its first amended complaint. UNR's delay is particularly inexcusable in the RICO context. Racketeering is a very serious charge which poses the threat of treble damages, and conversely must be based on a serious kind of injury. A person who suffers a RICO injury should "know it when [he feels] it." (Apologies to Justice Stewart; *see Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring)). To delay as long as UNR did to assert a Rico injury suggests that either UNR did not suffer that kind of serious injury or that the charge is made because of the *in terrorem* effect of any treble damage or racketeering claim.

On the other side, UNR's right to have its RICO claim heard on the merits is not as strong as it could be since counts 12, 13 and 14 of the first amended complaint already seek, relying on essentially a subset of the facts alleged in proposed count 2, the damages UNR could recover and treble under proposed count 2. While leave to amend should not be denied solely because the amendment duplicates existing counts to some degree, that is a consideration when determining what justice requires.

Based on all these considerations, the court concludes that UNR's delay and the prejudice to C & B outweigh UNR's right to have its RICO claim heard on the merits. *See Knapp v. Whitaker*, 757 F.2d 827, 849 (7th Cir. March 5, 1985) (delay of over one year plus prejudice sufficient to deny leave to amend). Therefore the motion to amend by adding proposed count 2 is denied.

### 3. Count 15

 Count 15 alleges that C & B's misrepresentations (that C & B had shopped around and only Continental would insure UNR) and omissions (that UNR was entitled to full defense and indemnity under its existing policies) violated Illinois's Consumer Fraud and Deceptive Business Practices Act (the "Act"), Ill.Rev.Stat. ch. 121½ par. 262, which prohibits "unfair methods of competition and unfair or deceptive acts or practices." However, "[u]nder the Act an effect on consumers generally is required, and none is present here." *Newman-Green, Inc. v. Alfonzo-Larrain*, 590 F.Supp. 1083, 1087 (N.D.Ill.1984); *see also Frahm v. Urkovich*, 113 Ill.App.3d 580, 585–86, 69 Ill.Dec. 572, 576, 447 N.E.2d 1007, 1011 (1st Dist.1983); *Exchange Nat. Bank v. Farm Bureau Life Ins. Co.*, 108 Ill.App.3d 212, 216, 63 Ill.Dec. 884, 887, 438 N.E.2d 1247, 1250 (3d Dist.1982). This case is easily distinguishable from *Barr v. Safeco Insurance Co.*, 583 F.Supp. 248 (N.D.Ill. 1984), and *Browder v. Hanley Dawson Cadillac Co.*, 62 Ill.App.3d 623, 20 Ill.Dec. 138, 379 N.E.2d 1206 (1st Dist.1978), on which UNR relies, since the plaintiffs in both those cases alleged a pattern of misrepresentations that affected consumers generally. Therefore, count 15 fails to state a claim and allowing its addition would be wholly futile.

### II. Proper Forum for the Remaining Claims

In the November 30 Opinion the parties were directed to submit briefs on where the case should proceed, because the only remaining claims were all state law claims with no possible federal jurisdictional basis other than the fact that UNR is a debtor. Since UNR has been denied leave to add new federal question claims, the issue of the proper forum is still relevant. There are two alternatives to this court: the bankruptcy court and a state court. In a rare display of harmony, all the parties filed briefs urging this court not to abstain in favor of a state court. National Surety Corporation later filed a supplemental brief arguing against referring the case to the bankruptcy court, and again no other party expressed disagreement.

### A. Bankruptcy Court

 Section 157 of Title 28, added as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984 (98 Stat.

333) (the "1984 Act"), defines the bankruptcy judges' jurisdiction and powers. The 1984 Act envisions three types of cases within bankruptcy jurisdiction—"civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). The district court has full jurisdiction over all three types of cases, but the bankruptcy judge has full jurisdiction (i.e., the power to "hear and determine" (28 U.S.C. § 157(b)(1)) only over "cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11" (*id.*). That is, a bankruptcy judge may not hear (except in a limited sense discussed below) proceedings "related to" cases under title 11. The first question is therefore whether UNR's case falls under § 157(b)(1) so that the bankruptcy judge has full jurisdiction to hear and determine it.

■ Certainly this is neither a case "under" title 11 nor a core proceeding "arising under" title 11 since UNR's complaint contains only state law claims that have nothing whatever to do with any federal law, much less title 11 specifically. The only remaining possibility—"core proceedings ... arising in a case under title 11"—also does not apply here for two reasons. First, UNR's claim is not a core proceeding. Claims (whether state-law or not) by the debtor against a non-creditor do not appear in the list of "core proceedings" given in § 157(b)(2). True, § 157(b)(2) expressly states the list given is illustrative and not exhaustive, but because the list given is extensive, specifically includes one kind of claim made by debtors (namely, counterclaims against creditors; see § 157(b)(2)(C)), and because claims against non-creditors are an important category of cases very much on Congress's mind when the 1984 Act was passed (see *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)), this court concludes that if Congress had wanted this kind of case to be considered a core proceeding it would have included it in the given list.

■ Second, two considerations show this case falls under the third kind of bankruptcy jurisdiction—"related to" jurisdiction—and therefore cannot fall under the first two types of jurisdiction, which as mentioned are the only two included in § 157(b)(1). The first consideration is the plain language of the statute. Of the three descriptions of bankruptcy jurisdiction in § 1334(b), only the "related to" phrase can sensibly be said to describe a case such as this, which has no connection with title 11 other than the fact that the plaintiff is a debtor. Moreover, adopting the contrary conclusion would do violence to two other important parts of the 1984 Act. Section 157(c)(1) applies to "a proceeding that is not a core proceeding but that is otherwise related to a case under title 11." If any proceeding fits that definition UNR's case does, especially since the magistrate-like duties created by § 157(c)(1) are Congress's attempt to satisfy the holding of *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which also involved a debtor suing a non-creditor. Similarly, the mandatory abstention provision of 28 U.S.C. § 1334(c)(2) applies to

a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section.

That definition exactly described UNR's suit, so if UNR's case is not a "related to" type of proceeding then § 1334(c)(2) would have no application. Therefore, the most sensible reading of the 1984 Act as a whole is that this adversary proceeding neither arises under title 11 nor arises in a case under title 11 but is simply related to a case under title 11 and, as such, is outside the scope of § 157(b). The legislative history supports that interpretation. See 98 Stat. at 587 (remarks of Senator Dole), *id.* at 594–96 (remarks of Senator Hatch), 130

Cong.Rec. H1848 (daily ed. March 21, 1984) (remarks of Rep. Kindness).[8]

Finally, even if the statutory language allowed it, referring this case to the bankruptcy judge for final determination would be questionable under *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which the Seventh Circuit has interpreted as holding that "state common law causes of action cannot constitutionally be decided by a bankruptcy court." *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1209 (7th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984). Of course, some of UNR's counts are based on state statutes rather than on common law, but that makes no difference to the constitutional question.

The second question is whether § 157(c)(1)[9] authorizes the bankruptcy judge to take this case. That section allows a bankruptcy judge to hear but not determine a related proceeding. In effect, the bankruptcy judge acts like a magistrate, submitting proposed findings of fact and conclusions of law to the district court. The district court must hear de novo any matter to which a party specifically objects, and then enter final judgment. Since the parties here have demanded and apparently are entitled to a jury trial on at least some counts of UNR's complaint, utilizing § 157(c)(1) would mean that two jury trials may be required, which is reason enough not to make the reference. *In re Smith-*

*Douglass, Inc.*, 43 B.R. 616, 618 (Bkrtcy.E. D.N.C.1984). Moreover, the phrasing of § 157(c)(1) strongly suggests that Congress did not expect bankruptcy judges to utilize juries under that section, since the requirement that the bankruptcy judge enter proposed findings of fact and conclusions of law leaves essentially no role for the jury, or at least a kind of role so different from the traditional one that it would be questionable whether such a jury is really a "jury" within the meaning of the Seventh Amendment. It also must be remembered that the Seventh Amendment not only protects the right to a jury trial but protects facts found by a jury from reexamination by any court except "according to the rules of the common law" and those rules have not yet evolved to allow the kind of de novo review required by § 157(c)(1). *See also In re Long*, 43 B.R. 692, 696 (Bkrtcy.N.D.Ohio 1984) (holding bankruptcy judge has no power under the 1984 Act to hold a jury trial); *In re Proehl*, 36 B.R. 86 (Bkrtcy.W. D.Va.1984) (interpreting *Marathon* as implying that allowing bankruptcy judge to conduct jury trial would be unconstitutional delegation). Therefore, a bankruptcy court cannot hold a jury trial in a case referred pursuant to § 157(c)(1) and this case, since it will require a jury, cannot be referred under that subsection.

## B. State Court

The 1984 Act contains two abstention provisions. One applies to state law

---

**8.** Since this court concludes that this case is beyond the scope of § 157(b) the catch-all definition of core proceedings in § 157(b)(2)(O) ("other proceedings affecting the liquidation of the assets of the estate"), which might otherwise be stretched to encompass UNR's case, does not apply here. The court also notes that its interpretation of "related to" makes one of the provisions concerning personal injury and wrongful death claims redundant. Section 157(b)(2)(B) specifically exempts personal injury and wrongful death claims from the definition of core proceedings, a step which was necessary only if Congress thought such claims (which obviously have nothing to do with bankruptcy law) would otherwise be categorized as "core proceedings ... arising in a case under title 11." The interpretation this court has adopted suggests that exemption was unnecessary because such claims are already outside the reach of § 157(b)

as a "related to" proceeding. However, § 157(b)(4) exempts personal injury and wrongful death claims from the operation of the mandatory abstention provision, a step which is necessary only if Congress thought such claims fall under the "related to" jurisdiction, since that is all § 1334(c)(2) covers. Therefore, no matter what interpretation of "related to" is adopted one of these two provisions—§ 157(b)(2)(B) or § 1334(c)(2)—will be redundant. An interpretation that results in a small and inevitable redundancy (which can probably be attributed to an abundance of caution on Congress's part) is better than one that makes senseless two sections of the 1984 Act.

**9.** Since the parties obviously do not *agree* to submitting this case to the bankruptcy judge, § 157(c)(2) does not apply.

proceedings and requires abstention when a party timely requests it and (1) the action has no federal jurisdictional basis other than the fact that it is related to a title 11 proceeding, and (2) an action is commenced and can be timely adjudicated in a state forum. 28 U.S.C. § 1334(c)(2). That section does not apply here, however, because, in addition to the fact that no party has requested abstention, section 122(b) of the 1984 Act states that 28 U.S.C. § 1334(c)(2) does not apply to cases pending on the date of enactment.

 The other abstention provision is permissive, and allows a district court to abstain "in the interest of justice, or in the interest of comity with State courts or respect for State law." 28 U.S.C. § 1334(c)(1). The parties argue that the relatively advanced state of these proceedings show that abstention would not be appropriate, and in these circumstances this court agrees. Abstaining would undoubtedly cause significant delay in the final resolution of this case. While that should not be a sufficient reason to decline abstention in every adversary case, here a prompt resolution is vitally important to UNR's reorganization and to UNR's creditors, particularly the asbestos plaintiffs. Therefore, this action will proceed in this court.[10]

IT IS THEREFORE ORDERED that:

(1) UNR's motion for leave to file a second amended complaint is denied, and

(2) This case will proceed in this court.

---

10. The parties do not challenge the constitutionality of the "related to" phrase of 28 U.S.C. § 1334(b), which gives this court jurisdiction over this case. Compare *In re Dakota Grain Systems*, 41 B.R. 749 (Bkrtcy.D.N.D.1984); *B–J's* *Liquors v. American Nat. Bank & Trust Co.*, 29 B.R. 1011 (N.D.Ind.1983); and the remarks of Senator Hatch during debate on the 1984 Act, 130 Cong.Rec. S8893 (daily ed. June 29, 1984).